0IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSHUA P. BRAITHWAITE,

Plaintiff,                                OPINION AND ORDER

v.                                                  24-cv-54-wmc

ANGELA MINK, MARIA LEMIEUX, DR. STACEY HOEM,
ANDREW SIERZANT, FLOYD WEBSTER,
CHANCE CASTEEL, WYATT WEADGE, TYLER HOLTHAUS,
PAUL BROWN-LUCAS and KYLE BAYNE,

Defendants.

State prisoner Joshua Braithwaite, representing himself, alleges that several members of the psychological services and security staff at Wisconsin Secure Program Facility ("WSPF") failed to take reasonable steps to prevent him from harming himself despite knowing that he had stockpiled medication and intended to overdose with it.  He was granted leave to proceed on claims under the Eighth Amendment to the United States Constitution and Wisconsin common law.  Defendants have filed now a motion for summary judgment arguing that plaintiff's claims lack merit.  (Dkt. #26.)  After considering all of the pleadings and exhibits in the light most favorable to plaintiff, defendants' motion for summary judgment will be granted on plaintiff's Eighth Amendment claims for the reasons explained below.  The court also declines to exercise supplemental jurisdiction over plaintiff's state law negligence claims now that his federal claims are resolved.

UNDISPUTED FACTS[1]

## A. Background

Plaintiff Joshua Braithwaite is a prisoner at Columbia Correctional Institution, but at times relevant to this case, he was incarcerated at WSPF. The named defendants all worked at WSPF during the times relevant to the case: Angela Mink and Maria Lemieux were psychological associates; Kyle Bayne, Andrew Sierzant, Wyatt Weadge, Chance Casteel and Floyd Webster were correctional officers; Paul Brown-Lucas was a lieutenant; Dr. Stacy Hoem was a psychologist; and Tyler Holthaus was a sergeant.

Braithwaite has a history of severe mental health illness, including an inability to resist the urge to relieve stress by engaging in self-destructive behavior. He is prescribed several psychotropic medications and works with Psychological Service Unit ("PSU") staff to address his ongoing mental health challenges. However, during December 2022 and January 2023, Braithwaite repeatedly refused to take some of his medications. According to Braithwaite, even when he accepted his medications during that time period, he frequently "cheeked" medications, meaning that he hid the medication in his cheek or somewhere else in his mouth to avoid swallowing it.

Correctional officers who dispense medication to inmates at WSPF are required by policy to check the inmates' mouths to ensure they do not hide medication. However, according to Braithwaite, officers did not always do so, resulting in him being able to stockpile medication. In particular, Braithwaite maintains that defendants Correctional

---

[1] Unless otherwise indicated, the following facts are undisputed and drawn from the parties' proposed findings of facts and responses, as well as the undisputed record evidence, where appropriate.

Officers Sierzant, Webster, Weadge and Casteel *knew* that he was stockpiling medication *and* was feeling suicidal, but they did nothing to prevent him from doing so. For their part, those defendants deny knowing that Braithwaite was cheeking medication, stating that had they known, they would have: noted his actions on his behavior log; issued him a conduct report for misuse of medication; and notified a supervisor, who would then authorize a strip search and cell search. Instead, Braithewaite's behavior log during this period notes only one incident on January 21, 2023 in which he refused to show under his tongue after receiving medication during medication pass, although there are several notes about his refusing to take a medication on particular dates.

### B.  Interactions with PSU Staff

Sometime in December 2022, Braithwaite told his assigned PSU clinician, Dr. Andrew Simcox, that he was going to stockpile medication and overdose with it. On December 20, however, Braithwaite denied suicidality or urges to self-harm and affirmatively told Dr. Simcox that he would notify staff if he felt the urge to self-harm. In particular, PSU records note at the time that Braithwaite told Dr. Simcox, "You have my word that I am not going to harm myself."

On December 29, 2022, while conducting PSU rounds, Dr. Hoem noted that Braithwaite was sleeping and left a puzzle packet for him. Braithwaite represents that on this date, he had covered his cell door window with a sign that said, "I wonder what it would feel like to die," although Hoem denies seeing such a note. Braithwaite also represents that other PSU staff members, including psychologists Lemieux and Mink,

attempted to meet with him between December 29, 2022, and January 2, 2023, while he still had the note on his door, although they, too, deny attempting to see him during this time or seeing a note. There is also no record that Braithwaite submitted any psychological service request ("PSR") to talk to a PSU clinician during that time nor any record that security staff contacted PSU about him. There is similarly nothing in Braithewaite's PSU, medical or security charts about the note that he represents was taped to his cell window.

### C. January 2, 2023 Overdose

On January 2, 2023, at 12:01 p.m., Correctional Officer Bayne spoke with Braithwaite outside of his cell. (Bayne's body camera captured this interaction and defendants submitted the footage to the court.) Braithwaite told Bayne he was upset that Sergeant Rebecca Eagleburger, whom he claimed to be in love with, had written him a conduct report. Braithwaite also said that he knew staff forced her to write the conduct report, because she would never have done so on her own. Braithwaite then told Bayne that if he did not get to speak to Eagleburger, he would overdose on stockpiled medication. Bayne responded that he would find out more information, but could not leave until he knew that Braithwaite would be ok. Braithwaite was agitated and refused to give Bayne the pills he was holding, so Bayne called Sergeant Tyler Holthaus for assistance. Before Bayne left Braithwaite's cell front, he told Holthaus to monitor Braithwaite, as he could not be left alone.

When Sergeant Holthaus arrived, he asked Braithwaite what was going on. (Holthaus's interaction with Braithwaite was also captured on body camera footage filed

with the court.)  Holthaus told Braithwaite that they had always had a good relationship, they respected each other, and he just wanted him to talk to him.  Braithwaite explained that he was upset because Sergeant Eagleburger had written him a conduct report and had been forced to stop speaking to him, even though she was the only person with whom he felt comfortable talking.  Holthaus asked Braithwaite what he would accomplish by overdosing on his medication and proposed different solutions to Braithwaite, such as talking to PSU about contacting Eagleburger.  Holthaus also told Braithwaite that he cared about him and reminded him of reasons to live, like his brother.

After a few minutes, around 12:08 p.m., Lieutenant Paul Brown-Lucas arrived at Braithwaite's cell front and took over the conversation.  As Holthaus moved aside, his keys made a noise and startled Braithwaite, who said, "Hey, don't be trying that shit." (According to Braithwaite, he thought Holthaus was trying to open the trap to release OC spray into his cell.)  Braithwaite then told Brown-Lucas about Sergeant Eagleburger's conduct report and said he would take all the pills he possessed unless she came to the unit to speak with him.  When Brown-Lucas asked him what pills he had, Braithwaite responded that he had been cheeking his psych pills for the past two weeks.

Brown-Lucas then directed Braithwaite to place the pills that he was holding onto the cell bed, and that he would talk to Braithwaite about the conduct report after he did so.  Instead, Braithwaite immediately showed Brown-Lucas what appeared to be an assortment of pills in his palm, placed the pills in his mouth, and swallowed them.  Brown-Lucas called for available unit officers to respond to Braithwaite's cell front and asked Braithwaite if he would comply with being removed from the cell.  After Braithwaite agreed

5

to comply, he was removed, searched, and transported to Gunderson Hospital via ambulance.

Braithwaite arrived at the hospital's emergency room approximately one hour after swallowing the pills. At the emergency room, Braithwaite reported taking 32 pills consisting of a mixture of acetaminophen (500mg), Seroquel (25mg), hydralazine (25 mg), and sertraline (25mg). While Braithwaite complained of dizziness, nausea and a racing heart to EMS, he denied any symptoms to emergency room staff. His vitals were also within normal limits, though his initial lab results showed an acetaminophen level of 32 ug/mL, which was considered "slightly elevated." His bloodwork was otherwise unremarkable, as was his EKG. Emergency room providers offered Braithwaite charcoal, which is often administered in suspected overdoses to reduce the risks of worsening gastrointestinal symptoms. However, after the provider poured the charcoal, Braithwaite became angry and threw the charcoal across the room and into the hall without drinking it.

Emergency room staff then called the Poison Control Center, which recommended repeating the testing of acetaminophen levels four hours after the initial ingestion, and if it was normal, discharging Braithwaite. Four hours post-ingestion, repeat labs showed Braithwaite's acetaminophen level was down to 18 ug/mL, which was within the normal range. Braithwaite was then discharged that same day from Gunderson Hospital at 5:19 p.m. and placed in clinical observation at WSPF.

The next day, on January 3, 2023, Braithwaite reported to HSU for follow up, stating that he felt well and had no symptoms or concerns. Also on January 3, Braithwaite

met with defendant Lemieux, who told him that he would be placed on a "keep-on-person" restriction, meaning that medications normally kept in his cell would now be staff controlled.

Psychologist Mink met with Braithwaite on January 4 and 5. She noted that his demeanor was positive, but that he was still upset about being unable to see a sergeant with whom he claimed to be in love. Even so, Mink released Braithwaite from clinical observation, as he denied thoughts of self-harm or intent to harm himself and unit staff had reported increasing behavioral and emotional stability.

**D. January 25, 2023 Overdose**

Approximately three weeks later, on January 25, 2023, at approximately 8:05 a.m., Braithwaite used his in-cell intercom requesting to speak with the PSU, a captain, and Sergeant Eagleburger. He also told security staff that if he did not speak to those people, he would commit suicide. Security staff then notified Captain Daniel Leffler, Sergeant Holthaus, and PSU. Holthaus responded immediately by going to Braithwaite's cell, where Braithwaite showed him a handful of pills. Defendant Mink from PSU told security staff that Braithwaite should be placed into observation.

Between 8:05 and 8:15 a.m., Sergeant Holthaus continued speaking with Braithwaite outside of his cell in an attempt to de-escalate the situation. (This interaction, too, was captured on Holthaus's body camera.) In particular, Sergeant Holthaus asked Braithwaite why he wanted to overdose, and Braithwaite kept repeating that staff were "playing games" with him and antagonizing him about Sergeant Eagleburger. Holthaus

7

tried to distract Braithwaite by asking him about his brother and telling him that he did not want him to kill or hurt himself.  Holthaus also told Braithwaite he would not be able to see Eagleburger that day because it was her day off.

At 8:14 a.m., Captain Leffler arrived at Braithwaite's cell front.  Braithwaite told Leffler that he would only put the pills down if he could see Eagleburger and if "staff would stop messing with him."  Leffler repeated that he could not retrieve Eagleburger, as she was unavailable and he would not call her at home.  Within 30 seconds of Leffler's arrival, Braithwaite swallowed the pills he was holding.  Braithwaite then voluntarily complied with coming out of his cell to HSU.  Once in HSU, he told the nurse he took about 50 pills, including Indomethacin, Clonidine and Hydroxyzine, which staff had "let him" stockpile.  Braithwaite rated his pain "five out of ten" and reported that he was "dizzy" and had a pain in his stomach.

Braithwaite was again transported to Gunderson Hospital, where he reported mild epigastric pain, but denied nausea or vomiting, lower abdominal pain, flank pain, urine symptoms, chest pain, shortness of breath, or any other concerns.  Braithwaite's vital signs were within normal limits.  Braithwaite declined activated charcoal, but he did agree to submit to an EKG, labs and monitoring in the emergency room.  Braithwaite's EKG and liver function tests were all normal, and his initial lab results showed negative salicylate, ethanol, and acetaminophen levels.  While Braithwaite's complete blood count and comprehensive metabolic panel tests showed some abnormal values, such as his glucose levels, doctors concluded that these results were unremarkable in the context of Braithwaite's overall diagnostic results.  Finally, emergency room staff called the Poison

Control Center, who recommended continued observation and repeat acetaminophen levels four hours after the initial ingestion, and if results were normal, to discharge Braithwaite. When repeated acetaminophen levels were undetectable, and Braithwaite remained stable throughout his stay, he was discharged in stable condition.

After Braithwaite was returned to prison, PSU staff placed him on clinical observation status, where he remained until January 30, 2023. During that time, Dr. Hoem discussed with Braithwaite that he needed to learn to work through problems, instead of threatening or engaging in self-harm as a means to get his demands met.

OPINION

Plaintiff claims that defendants violated his rights under the Eighth Amendment and state law by: (1) failing to prevent him from stockpiling his medications, despite knowing that he was cheeking medications and feeling suicidal; (2) failing to take steps to prevent his self-harm attempts, despite knowing that he had stockpiled medication and had a sign on his cell door alluding to suicide; and (3) failing to intervene to prevent him from swallowing pills on January 2 and 25, 2023. Defendants have moved for summary judgment on all claims.

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401,

406-07 (7th Cir. 2009).

At summary judgment, the court views disputed facts in a light most favorable to the plaintiff, as the nonmoving party, and construes all reasonable inferences from the evidence in his favor, *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017), but a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017), or "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016). Moreover, facts need only be taken in the light most favorable to the nonmoving party where there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

## I.  Eighth Amendment

Prison officials violate the Eighth Amendment if they are aware of an objectively serious risk of harm to an inmate and knowingly or recklessly disregard it. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To prevail on his Eighth Amendment claims, plaintiff must prove that: (1) defendants knew of a strong likelihood that plaintiff would seriously harm himself; (2) defendants consciously failed to take reasonable measures to prevent the harm; and (3) defendants' action or inaction caused plaintiff harm. *Lord v. Beahm*, 952

10

F.3d 902, 905 (7th Cir. 2020); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012).

Defendants contend that plaintiff cannot prove the second or third elements of his Eighth Amendment claims. As to the second element -- a conscious failure to take reasonable measures to help plaintiff -- defendants argue that no reasonable jury could find that PSU or security staff knowingly permitted him to stockpile psychiatric medications despite knowing he was suicidal. In addition, with respect to the two overdose incidents, defendants point out that both responding security and PSU staff acted with sympathy, patience and -- after plaintiff swallowed the pills -- efficiency in obtaining medical care for him. Thus, defendants assert that plaintiff has failed to offer proof of their conscious disregard or deliberate indifference to his risk of self harm.

The court need not resolve this case on this second element of plaintiff's Eighth Amendment claims, however, because defendants' alternative argument has even more traction: no reasonable jury could find that plaintiff was harmed by the medications he consumed on January 2 or 25, 2023. *See Bolden v. Mezo*, No. 22-1571, 2023 WL 4488861, at *2 (7th Cir. July 12, 2023) ("An injury is necessary for a constitutional tort under § 1983."). Indeed, an inmate can only maintain an Eighth Amendment claim under § 1983 if "the harm that befell the prisoner [was] objectively, sufficiently serious and a substantial risk to his or her health or safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). In more recent decisions, the Seventh Circuit has emphasized that, while suicide and self-harm are objectively serious risks, *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019), that "*risk* is not compensable without evidence of injury." *Lord*, 952 F.3d at 905 (emphasis

11

added).  Nor is superficial harm or minor injury sufficient to support a constitutional claim. *See Lord*, 952 F.3d at 905 ("few minor scratches" on forearm from razor blade treated with a gauze bandage were "trivial—indeed, almost nonexistent"); *Douglas v. Schwartz-Oscar*, No. 20-3489, 2021 WL 6102971, at *2 (7th Cir. Dec. 22, 2021) (physical injuries from self-harming that consisted of minor cuts and scratches treatable with band-aids and cream not cognizable harms under the Eighth Amendment); *Keith v. Carlson*, No. 22-CV-548-PP, 2025 WL 370115, at *11 (E.D. Wis. Jan. 31, 2025) (plaintiff's self-inflicted cuts that did not deeply penetrate skin and required only ointment to treat were not sufficient serious injuries); *Turner v. Boughton*, No. 19-CV-1001-JDP, 2023 WL 4930102, at *7 (W.D. Wis. Aug. 2, 2023) (plaintiff's reports of "sharp abdominal pains, nausea, lightheadedness, and [] diarrhea" following his overdose were "only minor problems insufficient to support an Eighth Amendment claim"); *Artis v. Price*, No. 19-cv-303-wmc, 2021 WL 4086208, at *5-*6 (W.D. Wis. Sept. 8, 2021) (three pea-sized skin tears to self-harming inmate's forearm that required some cleaning, a band-aid and no follow-up care not cognizable harm under the Eighth Amendment); *Davis v. Gee*, No. 14-CV-617-WMC, 2017 WL 2880869, at *6 (W.D. Wis. July 6, 2017) (plaintiff's swallowing a "handful of Tylenol pills," which caused no significant symptoms and required no treatment, not sufficient to sustain Eighth Amendment claim).

This plaintiff in particular is well aware of this principle as his cases have been previously dismissed for failure to show a cognizable injury from his self-harm attempts. *See Braithwaite v. Bille*, No. 17-CV-706-PP, 2022 WL 1241185, at *2 (E.D. Wis. Apr. 27, 2022) (holding that plaintiff's "superficial abrasions" treated with bandages and cream

were not cognizable physical injuries); *Braithwaite v. Smelcer*, No. 18-CV-1507, 2021 WL 101122, at *1 (E.D. Wis. Jan. 12, 2021) (minor self-inflicted arm scratches after threats of suicide not sufficient to support constitutional claim).

Here, it is undisputed that plaintiff's overdose attempts did not cause him any serious injury nor even require treatment. When plaintiff was transported to the hospital on January 2, 2023, he initially had elevated acetaminophen levels, but there is nothing in the record indicating that the levels amounted to a serious medical condition. To the contrary, plaintiff refused the only treatment offered, his liver was able to process the medication he had in his system, and he was discharged without any medical intervention. Similarly, on January 25, 2023, plaintiff refused charcoal treatment and his overdose resulted in no serious harm: his heart rate was regular and his vital signs, EKG and liver function tests were again normal. Moreover, his initial lab results showed negative salicylate, ethanol and acetaminophen levels, and while Braithwaite's complete blood count and comprehensive metabolic panel tests showed some abnormal values, such as his glucose levels, his medical providers determined that the results were unremarkable in the context of his overall diagnostic results. Finally, when staff repeated his acetaminophen tests four hours after his initial test, his acetaminophen levels were undetectable without *any* medical intervention.

In sum, there is no evidence that plaintiff ingested enough of any medication on either January 2 or January 25, 2023, for a reasonable jury to find that he had a serious medical condition or suffered any serious injury. Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims. *See Boynton v. Kaeder-*

13

*Schneider*, No. 23-CV-368-WMC, 2025 WL 26718, at *5 (W.D. Wis. Jan. 3, 2025) ("Because there is no evidence showing plaintiff suffered serious harm as a result of the medication he consumed, plaintiff cannot recover damages" and defendants are "entitled to summary judgment.")

### II. State Law Negligence

The court originally exercised supplemental jurisdiction in granting plaintiff leave to proceed over plaintiff's state law negligence claims against defendants under 28 U.S.C. § 1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action.  However, plaintiff has alleged no other basis for federal jurisdiction over his state-law claims beyond his now dismissed Eighth Amendment claims, including diversity jurisdiction, since he and defendants are all Wisconsin citizens.  Absent unusual circumstances, when all federal claims have been dismissed before trial, as in this case, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims.  *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019).  Because neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiff's state-law claims, therefore, the court will decline to exercise supplemental jurisdiction without evaluating its merits.

Plaintiff may still pursue his negligence claims in state court, subject to applicable statutes of limitations or any other procedural bars.  While those limitations and bars periods may have been tolled during the time that this case has been pending, they will begin to run again 30 days from the date of this order.  *See* 28 U.S.C. § 1367(d) ("The

period of limitations for any claim asserted under [the court's supplemental jurisdiction] .

. . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed

unless State law provides for a longer tolling period."). **Accordingly, plaintiff will need**

**to proceed in state court sooner rather than later, should he wish.**


ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #26) is

GRANTED as to plaintiff's federal claims under the Eighth Amendment, and plaintiff's

state-law claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c)(3).

The clerk of court is directed to enter judgment and close this case.


Entered this 15th day of January, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge